JACOB BLAUSTEIN, Plaintiff Below, Plaintiff in Error, v. STANDARD OIL COMPANY, a Corporation of the State of Indiana, Defendant Below, Defendant in Error.

JACOB BLAUSTEIN, HENRIETTA BLAUSTEIN, FANNY B. THALHEIMER and RUTH B. ROSENBERG, Executors of Louis Blaustein, Deceased, Plaintiffs Below, Plaintiffs in Error, v. STANDARD OIL COMPANY, a Corporation of the State of Indiana, Defendant Below, Defendant in Error.

AMERICAN TRADING AND PRODUCTION CORPORATION, a Corporation of the State of Maryland, Plaintiff Below, Plaintiff in Error, v. STANDARD OIL COMPANY, a Corporation of the State of Indiana, Defendant Below, Defendant in Error.

450

(*October* 28, 1946.)

HARRINGTON, Ch., TERRY, CAREY and PEARSON, J. J., sitting.

*Clarence A. Southerland, Caleb S. Layton* and *Aaron Finger, Nathan L. Miller* (of New York, New York), and *Karl F. Steinmann* (of Baltimore, Maryland) for Plaintiffs Below, Plaintiffs in Error.

*Hugh M. Morris, Edwin D. Steel, Jr.,* and *S. Samuel Arsht,* and *Ralph S. Harris, John R. McCullough* and *Frederick W. F. Lorenzen* (of New York, New York), for Defendant Below, Defendant in Error.

Supreme Court of Delaware.

PEARSON, J., delivering the opinion of the court:

Plaintiffs assert error in orders of the Superior Court in three actions allegedly for damages for breaches of covenants. Defendant is a corporation of another state and has not been served with process. Jurisdiction to proceed against it in these actions is predicated upon a foreign corporation attachment statute, *Rev. Code of Del.* 1935, Sec. 4631, and attachments of property of defendant purportedly made under authority of that act. The Superior Court held that the statute does not authorize a writ in any of plaintiffs' cases for the reason, briefly, that it requires as a condition of the issuance of a writ that a plaintiff file an affidavit that the defendant "is justly indebted to the said plaintiff in a sum of money, to be specified in said affidavit"; and because of the uncertainty in amount of any damages plaintiffs may have sustained, they cannot properly comply with this condition. Broadly stated, the principal question before us is whether the statute is applicable generally in actions ex contractu, or only in a limited class of such actions depending upon qualifications with respect to the damages claimed.

The first and pertinent paragraph of the statute reads thus:

"A writ of foreign attachment may be issued out of the Superior Court of this State against any corporation, aggre-

gate or sole, not created by or existing under the laws of this State, upon affidavit made by the plaintiff or any other credible person, and filed with the Prothonotary of said Court, that the defendant is a corporation not created by, or existing under the laws of this State, and is justly indebted to the said plaintiff in a sum of money, to be specified in said affidavit, and which shall exceed fifty dollars."

Of the three cases before us, we shall first consider the case discussed in some detail in the opinion of the Court below. The plaintiff, Jacob Blaustein, filed an affidavit that defendant "is justly indebted to the plaintiff in a sum exceeding Fifty Dollars ($50.00) to wit, in the sum of Seven Million Seven Hundred Twenty Thousand Dollars ($7,720,-000)." A writ of foreign attachment was issued and the return indicates that the sheriff attached certain property of the defendant. Before any declaration was filed, defendant's attorneys petitioned for leave to appear specially for defendant "solely for the purpose of: * * *

"Second. Applying for a rule against plaintiff to state its cause of action * * * in order that if leave to enter a special appearance is granted, and the rule issues and is made absolute, the Court may determine in limine and upon motion made by the attorneys aforesaid under special appearance, whether the cause of action relied upon by plaintiff will justify or support a writ of foreign attachment under 4631, Sec. 26, Chap. 126 of the *Revised Code of Delaware*, for the following reason:

"(1) If the covenants thereof relied upon are not for the payment of a liquidated sum, or are for an unliquidated sum the amount of which is not susceptible of ascertainment by some standard fixed by the contract itself, or are for an amount which cannot with propriety be averred in the affidavit and which must be altogether uncertain until the jury

have ascertained it, the writ of foreign attachment is not authorized or supported by 4631 of the *Revised Code of Delaware* 1935, or other law of this State."

An order was entered on the petition "that permission be granted * * * the petitioners * * * to appear as requested therein."

Defendant moved to quash the writ, set aside the return and dissolve the attachment. The only reason assigned, with which we are here concerned, reads as follows:

"If plaintiff shall be ruled to state his cause of action, pursuant to the motion filed by defendant herein for that purpose, and it shall appear from said statement that the covenants relied upon are not for the payment of a liquidated sum, or are for an unliquidated sum the amount of which is not susceptible of ascertainment by some standard fixed by the contract itself, or are for an amount which cannot with propriety be averred in the affidavit and which must be altogether uncertain until the jury have ascertained it, the writ of foreign attachment is not authorized or supported by 4631 of the *Revised Code of Delaware* 1935, or other law of this State."

In addition to this motion, defendant applied for and obtained a rule against plaintiff to state his cause of action. Plaintiff then filed a declaration. After argument on defendant's motion, the court ordered the writ quashed and the attachment dissolved.

Plaintiff contends that the propriety or legality of the issuance of the attachment writ must be decided from the affidavit alone, without examining the declaration, by reason of Section 4607 of the Code. This section reads thus:

"The Superior Court, in term time, or any judge in vacation, upon the petition of any defendant or tenant whose

property, rights or credits may be attached under any mesne process of attachment issued out of said court or by a justice of the peace, shall investigate the allegations contained in any affidavit required by law to be made and filed before the issuing of such process except such allegations as relate to the indebtedness of the defendants to the plaintiff, * * *."

This section provides a simple method whereby a defendant may promptly obtain a judicial inquiry into certain allegations of an attachment affidavit. It excepts from such inquiry the allegations relating to the "indebtedness." But we do not construe it as forbidding the court from quashing the attachment writ if, as defendant contends, only a limited class of contract claims may properly be asserted under Section 4631 of the Code, and if plaintiff's claim, even assuming it to be valid as he has stated it in his declaration, is not within such class. It seems to us that this is the basic ground which defendant asserted in support of his motion to quash, and upon which the decision of the court below was based. Plaintiff's construction of Section 4607 would impose a purposeless restriction upon a defendant's right to challenge the jurisdiction to proceed against him and is not required by the language of the section.

Plaintiff's declaration contains two counts. From them it appears that plaintiff and his father were for many years engaged in the business of marketing petroleum products. About 1932, a dispute arose between the Blausteins and defendant concerning transactions entered into by a corporation called Pan American Petroleum & Transport Company (Pan American). At that time, defendant owned about 96% of the capital stock of Pan American; and the Blausteins were interested in Pan American's activities because of a contract with it, or a subsidiary, for the supply of certain oil requirements. After negotiations, the Blausteins, defendant, Pan American, and two other companies

entered into an agreement, not under seal, dated "as of January 1, 1933," for the purpose of effecting a reorganization of Pan American (including subsidiaries) and the two other companies. The present action is founded upon an alleged agreement of March, 1933, under the seal of defendant, which confirms portions of the January agreement. For a brief statement of the nature of plaintiff's claim, it will suffice to adopt the following summary from the opinion below:

"The first count of the declaration alleges that by contract the defendant bound itself to cause Pan American to secure sufficient crude oil reserve and to maintain a backlog of crude oil properties sufficient for its operation; that defendant failed to require Pan American to secure such backlog of crude oil properties, but on the contrary bought such properties itself, and sold such oil to Pan American, knowing that Pan American requirements were 40,000 barrels of crude oil per day. The declaration then alleges that the value of the oil sold to Pan American, together with the value of the crude oil production remaining in the possession of the defendant, and after deducting the defendant's cost thereof, amounted to $255,239,800.62; the declaration then avers that as he owns 2.956% of the stock of Pan American, so he is injured, and has sustained damage to the extent of $7,546,078.20.

"The second count is based upon the alleged failure of the defendant to cause a refinery to be erected by a stipulated time, and having a capacity of 40,000 barrels per day. The count sets out that the delay in erecting the refinery and the necessity that Pan American obtain some of its requirements from another source (alleged to be a subsidiary of the defendant) caused a loss to Pan American of $6,848,823.47. The plaintiff then alleges that he, as the owner of 2.956%

of the stock of Pan American, has been damaged to the extent of 2.956% of the total damage." ·

In holding that the attachment must be dissolved and the writ quashed, the court said:

"To us it seems that no one, in order to avail himself of a violent and unusual process, can properly swear to an indebtedness and specify the amount of such indebtedness, unless such indebtedness is either liquidated in character or capable of being made certain by some fixed or available formula. One cannot specify what one cannot ascertain. We think, then, the damages must either be liquidated in character, be ascertainable from the contract itself, or be able to be specified by some definite formula which the law itself supplies to meet a given case.

"We do not say that the indebtedness can only be shown for a fixed or liquidated sum as in an action of debt. We do not say that foreign attachment proceedings in ex contractu actions cannot be maintained where the damages are unliquidated, but where either the damages are ascertainable from the contract itself, or by a formula as fixed and recognized as if specifically provided."

From a consideration of the nature of plaintiff's claim, the court concluded:

"We shall not pause to consider in detail the many reasons which suggest themselves as showing that these damages are not only unliquidated, but incalculable by any formula set out in the contract, or ordinarily available as a basis of an affidavit specifying the amount of the indebtedness. We think such damages are general in character, as distinguished from those arising from an express or implied promise to pay.

"We think the damages, assuming the plaintiff is en-

titled to recover them individually in a court of law, are not such damages as create an indebtedness the amount of which can be specified within the meaning of Sec. 4631, authorizing proceedings by foreign attachment."

Thus, the court found that what the statute requires to be set forth in the affidavit limits the kind of claims against a foreign corporation which may be asserted by foreign attachment; and that such claims are only those which would support contract actions for damages which are ascertainable or specifiable within the qualifications stated in the quoted extract. Plaintiff contends that any claim of indebtedness arising from contract is sufficient to support an action by foreign attachment. Defendant contends that the test of whether a writ of foreign attachment may issue is the same test utilized to determine whether a particular case falls within the common law action of debt.

The Superior Court, following other authorities, referred to foreign attachment as "a violent and unusual process." It is obvious that these words were used in a limited, special sense. Foreign attachment is not "unusual" in the sense of being a rare or infrequently authorized process. Indeed, it is widespread, certainly in the United States, and for scores of years, instances of its use have been matters of everyday occurrence. Nor is it "violent" in the sense of fierce, savage, or characterized by extreme, unjust, or improper force. Its "violent and unusual" aspects are characteristic of in rem and quasi in rem proceedings, among others. For example, it may be called "violent and unusual" in somewhat the same sense, in greater or less degree, as may replevin, seizures of property in admiralty proceedings, and restraining orders, all of which involve legally permissible forceful interferences with persons or property, prior to final adjudication of the ultimate questions concerned. Instead of calling foreign attachment "violent and

unusual," it might perhaps be more meaningful to say that since it permits such interferences, before any violation of rights of the moving party is established, it may lend itself to abuse in practice and, therefore, it calls for appropriate safeguards to avoid abuses.

The court also commented that attachment statutes "have uniformly required and received a strict construction." Accepting this as correct, we think it important, nevertheless, to be mindful that strict construction is more in the nature of an aid than an end; and that as an aid, it cannot be relied on as a single, precise formula for solving a problem, but only as a limited, partial guide. The expression unfortunately tends to imply that in every case there are only two possible constructions, one strict and one broad. The fact is that there usually exist many possible constructions of language which presents a constructional problem of any appreciable subtlety. Of course, if we single out a set of constructions, we can frequently say that some are strict compared with others, in that the strict would embrace or apply to fewer situations than the others. Thus, the court's construction of the statute here may be viewed as relatively strict or relatively broad, depending entirely upon the other possible constructions with which we choose to compare it. The same may be said of the respective constructions urged by plaintiff and defendant. Again, it would lead to absurd consequences to employ "strict construction" as though it required the adoption of that meaning which would confine the scope of the language to the least number of items of possible content without regard to other guides to construction, such as the context, the "reasonableness" of the various constructions, etc. It seems to us that "to construe strictly" means little more than this: in the process of interpreting language, to treat as one among other considerations, a preference towards those possible constructions which would

result in the inclusion or denotation of the least number of situations or items of content; such preference varying in its determinative effect, depending upon how it is evaluated with relation to the other relevant considerations. And so here, in applying the precept of "strict construction," we shall not hesitate to take into account other guides to interpretation and to accord them as much importance as they seem to merit.

The beginning point of our consideration of Section 4631 is directed by the similarities and differences found in earlier attachment statutes in Delaware. These seem of such relevance that they should be discussed before attempting to examine particularly Section 4631. In the case of each legislative provision, attention will be focused primarily upon the kinds of claims which are or were properly assertable under it.

(1) 1770 Attachment Act. In 1770, an act was adopted "directing the manner of suing out attachments within this government." 1 *Laws of Del.*, p. 460. The preamble reads thus:

"Whereas an act of General Assembly of this government, passed in the twenty-fifth year of the reign of his late Majesty George the Second, intituled, An act for regulating attachments within this government, (a) hath been found by experience to be defective, and not to answer all the good ends and purposes thereby proposed; * * *."

Section 2 of the act provides that no writ of attachment against a "residenter" shall issue:

"until two non est inventus's are successively returned to the Sheriff or Coroner, upon two writs taken out against him, and such proof made of the cause of action as the court shall think fit; or until the person or persons requesting such writ of attachment, or some other credible person for

him, her or them, shall upon oath or affirmation declare, that the said defendant is justly indebted to the plaintiff in the sum of Forty Shillings and upwards, and absconded from the place of his or her usual abode, or is gone out of the government with an intent to deceive and defraud his or her creditors, as it is believed * * *."

Under this section, there are two provisions or methods for obtaining the issuance of an attachment writ. For brevity, they will be referred to as the "cause of action" clause (or method), and the "justly indebted" clause (or method). The section does not expressly designate the kinds of claims which will support a proceeding under it. Nor does it expressly provide whether or not the two methods are coextensive in scope with respect to the kinds of claims assertable under them. The words "cause of action" in the first clause would seem to embrace all claims cognizable at law, including tort. Compare: *Smith v. Armour & Co.*, 1 *Penn.* 361, 364, 40 *A.* 720, 721. The words "justly indebted" in a sum, found in the second clause, do not ordinarily refer to liability arising from a tort, but are generally employed to denote liability under one or more classes of contract claims, the scope of which varies in accordance with the context, from claims for a debt in the sense of any obligation arising ex contractu, to claims for a debt in the sense of a sum of money due by certain and express agreement. Compare: *Drake on Attachment*, 3d *Ed.*, pp. 10, 11, note 6; 42 *C. J. S.*, pp. 554, 555; The Oxford Dictionary: "indebted." The sense in which these expressions ("cause of action" and "justly indebted" in a sum) were used in Section 2 of the 1770 Act is indicated clearly in subsequent sections of the act,[1] all of which may be properly

[1]Relevant portions of Sections 3 to 14 are quoted in the following partial abstracts (emphasis supplied):

Section 3 directs the sheriff to attach property of the defendant "for use of the *creditors* of the defendant".

Section 4 provides that if the plaintiff shall die, the action shall

viewed as providing a series of related steps or aspects of an integrated procedure. This procedure includes the attachment of a defendant's property for the use of his "creditors," as a sale of the property, and a distribution of the proceeds among the "creditors" in complete or partial satisfaction of their claims against him—"debts," "demands," "duties." As used in the act, the word "creditor" will not reasonably admit of a more strict construction than "He who has a right to require the fulfillment of an obligation or contract." 1 *Bouv. Law Dict., Rawle's Third Revision*, p. 726. Likewise, we feel it would require a forced and unnatural construction of the sections to limit claims assertable under the procedure more narowly than to the general class of obligations arising ex contractu.

But even conceding that contract claims generally may be asserted before the auditors, and distribution made on account of them, defendant would say that claims for unliquidated damages could support the initial process solely

---

not abate, but the court may order a suggestion of the death of the plaintiff "and substitute the name of *any other of the creditors*, consenting thereto".

Section 6 concerns proceedings against garnishees and provides that garnishees may answer "at the request of the plaintiff, *or any other creditor*"; or that the plaintiff "*or any other creditor or creditors*" may require garnishees to make a certain plea, and may "take issue thereon and proceed to trial."

Section 7 concerns garnishees who reside in another county or government or who are about to depart, and authorizes certain proceedings against them by the plaintiff "or *any creditor* claiming any benefit by or under such writ of attachment".

Section 8 provides for the appointment of three freeholders "to audit the accounts of *all the defendant's creditors* [with exceptions concerning certain debts under forty shillings] * * * and to adjust and ascertain the *demands* as well of the plaintiff or plaintiffs in the attachment, as of *all the rest of such creditors* of the defendant"; and to report to the Justices who shall have power to correct errors "either in the allowance of any *debts or demands* against the defendant, which, by law, ought not to be allowed, or in the calculations of the dividends to be made of the defendant's estate and effects amongst the *creditors*, or otherwise howsoever."

Section 9 directs the auditors to give "notice to the *creditors*" of their meetings, and provides that "all and every *creditor and creditors*

under the "cause of action" method of Section 2. Such a
view can only be arrived at, we think, by seizing upon the
expression "justly indebted" in a sum, and construing it in
a strict sense, in disregard of the interpretational aid fur-
nished by what follows in the act as an integral part of the
procedure. Sections 3 to 14 fairly proclaim that the per-
sons for whose benefit the procedure was designed were
"creditors." The sections not only fail to differentiate be-
tween classes of "creditors," but expressly treat any plain-
tiff (by whichever method the proceeding be instituted) and
"other creditors" as members of the same class. Thus, if a
plaintiff (who proceeded under either the first or second
method) should die, *any other creditor* consenting could be
substituted for him (Sec. 4). Again, the plaintiff or "any
other creditor" is authorized to proceed in various ways
against garnishees (Secs. 6, 7) ; the auditors are directed to
ascertain the "demands" of the plaintiff and of "all the

neglecting or refusing to attend * * * according to such notice, and then
and there to make proof of his, her or their *debt or debts or other de-
mands*," shall be debarred from receiving any share on the distribution
of the defendant's property. It further provides, "for the avoiding of
frauds", that the auditors may examine upon oath or otherwise "all or
any of the creditors of the defendant for the finding out and discovery
of the truth and certainty of *the several debts due and owing* to such
creditor or creditors".

Section 10 provides for an order of sale of the defendant's property,
and the delivery of the proceeds to the auditors who are directed to
calculate and settle the shares *"due to the several creditors* of the defen-
dant * * * and to distribute and pay to the said creditors * * * their rate-
able or proportionable parts of the said money, according to the *quan-
tity of their respective debts*," allowing to the plaintiff a double share,
provided it does not exceed "his, her or their *debt*."

Section 13 provides "That the overplus of the defendant's or debt-
or's estate (if any be) remaining after all his, her or their *debts*, and
the lawful costs and charges are paid and deducted, be returned to such
defendant or defendants".

Section 14 provides that if the creditor or creditors be not fully sat-
isfied "for his, her or their *debts and duties*" by the attachment pro-
ceedings, "then the said creditor or creditors, and every of them, shall
and may have their remedy for the recovery and levying of the residue
of their said *debts or duties* against the debtor" in the same manner as
they would have had before this act; and that creditors shall be barred
only for the portion of their *"debts and duties"* distributed to them
by order of the auditors.

rest" of the defendant's creditors (Sec. 8). The act does distinguish between a plaintiff and other creditors by providing that the plaintiff shall receive a double share upon distribution (Sec. 10), but this is applicable regardless of which method is followed to institute the proceeding.

The expression containing the words "debts," "demands," or "duties" indicate that those responsible for the act intended no distinction between the kinds of claims assertable under the two initiating methods. Defendant says that this construction "erroneously assumes that the words * * * are not to be applied severally or respectively to the subject matter of the particular clause" of Section 2 "under which the writ was granted and to which those words are severally and respectively appropriate." Continuing, defendant argues:

"The General Assembly realize the difference between 'debts' which could be the subject matter of an affidavit of just indebtedness and 'duties' or 'demands,' which might be the subject matter of an action under the cause of action clause of the statute. As the sections * * * were applicable generally to attachments whether commenced under the cause of action clause or the justly indebted clause, the legislature felt it necessary to state specifically that the subject matter of the claims involved could be either debts or demands, or debts or duties."

That such distinctions were made or intended is convincingly negatived by the language of the sections themselves. Inacceptable incongruities would result unless the word "debts," as used in several places, be construed as having a scope at least equivalent to that of the words "demands" and "duties." For example, under Section 9, creditors who do not prove their "debt or debts or other demands," as directed, are barred from receiving any share of defendant's property; and yet, where the auditors are au-

thorized, in the same section, to examine creditors upon oath, such examination is with respect to "the several debts due and owing" to such creditors, the words "other demands" not being employed. Under Section 10, the plaintiff is entitled to a double share on distribution provided it does not exceed his "debt"; but surely the word "debt" here is not used less broadly than the words "demands" and "duties" elsewhere. Likewise, under Section 13, the defendant is entitled to the overplus remaining after his "debts" (plus costs and charges) are paid; but whatever is included by the word "demands" elsewhere must be embraced by the word "debts" here.

It has been contended that the procedure of the Custom of London and the ancient procedure existing in arrest by capias offer analogies which argue for a limitation of the kinds of claims assertable under the "justly indebted" clause. We think these analogies relatively remote, compared with the component sections of the very act which authorized the process. The latter seem entitled to particular weight when it is remembered that this act was to replace previous legislation which had "been found by experience to be defective, and not to answer all the good ends and purposes thereby proposed." (Preamble, quoted above.) Faced with this statement of purpose, we should be reluctant to cast aside the meaning which seems plain from the act itself, adopted as it was, especially to be operative in Delaware, in favor of analogies to these other procedures which were or had been operative in England. Consequently, we construe the two initiating methods as not distinguishing between the kinds of claims assertable under them, and hence, in this respect, as coextensive in scope.

The act of 1770 deals with the subject of foreign as well as domestic attachment. By Section 16, it provides that

no writ of attachment against persons residing out of this State shall issue:

"until one non est inventus is returned by the Sheriff or Coroner upon a writ taken out against such non-resident, and delivered to such Sheriff or Coroner at least ten days before the return thereof, and such proof made of the cause of action as the court shall think fit, or until the person or persons requesting the said writ of attachment, or some other credible person for him, her or them, shall upon oath or affirmation declare, that the said defendant is justly indebted to the plaintiff in the sum of Forty Shillings and upwards, and avoids coming into this government lest he or she be taken to answer his or her just debts, as it is believed, * * * whereupon a writ of attachment shall be granted to each and every such person requiring the same, directed to the Sheriff or Coroner, * * * and shall be by him executed, and like proceedings had against the defendant and defendants therein, and the garnishees summoned thereon, as herein before is also directed, without the subsequent steps of appointing Auditors and making distribution; but that every plaintiff in an attachment against a non-resident shall have the benefit of his own discovery, and after judgment had, the court shall award execution to be made by fieri facias, capias ad satisfaciendum, or otherwise, as on other judgments."

The provisions of Sections 2 and 16 are markedly similar. Each contains a "cause of action" and "justly indebted" method for obtaining an attachment writ. Differences in the provisions of the two sections bear no reasonable relation to the kinds of claims assertable. Section 16 expressly points out certain respects in which procedure under it differs from the domestic attachment procedure; but says nothing about the kinds of claims assertable. The "justly indebted" expression is in the same language in each section.

It seems so unlikely that this expression was used in different senses in the two sections that we feel bound to conclude that any ex contractu claim would support a proceeding under either of the initiating methods of Section 16.

(2)    1823 Amendment and 1852 Code.    In 1823, the act of 1770 was amended with respect to the foreign attachment section, 6 *Laws of Del.*, p. 261.    The terminology of authorization of a writ was changed from forbidding its issuance *unless* conditions were complied with, to allowing its issuance *upon* compliance with conditions. The "Forty Shillings" minimum of the 1770 Act was changed to "fifty dollars."   The amendment repeals the requirement of making oath "that the defendant avoids coming into this government, lest he or she be taken to answer his or her just debts." In the 1852 Code, Chap. 104, Sec. 19, p. 374, the foreign attachment section appears as follows:

"A writ of *foreign attachment* may be issued against any person not an inhabitant of this State, after a return to a summons, or capias, issued and delivered to the sheriff, or coroner, ten days before the return thereof, showing that the defendant cannot be found, and proof, satisfactory to the court, of the cause of action; or upon affidavit made by the plaintiff, or some other credible person, and filed with the prothonotary, *that the defendant resides out of the State, and is justly indebted to the said plaintiff in a sum exceeding fifty dollars.*"

It seems clear that none of the changes in the language of the 1770 Act affect the "justly indebted" phrase either expressly or by reasonable implication.   Thus, any kind of contract action would support the use of either method of obtaining a writ under the 1852 Code.

(3)    1857 Act.    In *Vogle v. New Granada Canal & Steam Co.*, 1 *Houst.* 294, decided in 1856, an attempt was

made to attach property of a foreign corporation, apparently in reliance upon the 1852 Code section quoted above. The court held that the existing statute did not authorize proceedings against foreign corporations by attachment of their property, and that such proceedings were limited to natural persons. In 1857, an act was passed entitled "A Supplement to Chapter 104 of the Revised Statutes of the State of Delaware." 11 *Laws of Del.*, p. 482. This is the first foreign attachment act which is in terms applicable to foreign corporations. It need not be quoted here since its first section is in the same language as the first paragraph of the present Section 4631 of the 1935 Code, with which we are immediately concerned and which appears earlier in this opinion.

The 1857 Act is closely related to the 1852 Code provisions by express reference, and in its history, purpose and content. Each authorizes the issuance of a foreign attachment writ upon the filing of an affidavit. The affidavit must set forth:

(Under the 1852 Code provision) "that the defendant resides out of the State, and is justly indebted to the said plaintiff in a sum exceeding fifty dollars" or

(Under the 1857 Act) "that the defendant is a corporation not created by, or existing under the laws of this State, and is justly indebted to the said plaintiff in a sum of money, to be specified in said affidavit, and which shall exceed fifty dollars."

Do the differences in these requirements call for a different construction of the kinds of claims assertable under the respective sections? The only difference we think worth considering in this connection is the language "to be specified in said affidavit." The Superior Court and defendant have construed this direction as requiring some-

thing to be done which cannot be done except in cases where the damages claimed meet the tests of ascertainability which they have respectively stated and which we have mentioned below. Let us analyze what is required to be done. Now, both acts require a categorical statement that the defendant is "justly indebted" in a sum. Such a statement is a legal conclusion. Whether actual litigation of the plaintiff's claim would result in an adjudication in his favor, in whole or in part, is something he cannot possibly foretell with certainty. The requirement does not mean that a plaintiff must assure an ultimate adjudication of indebtedness; or even that he cannot use the process if he thinks his is a "close" case. Consequently, we think the requirement cannot sensibly be interpreted as exacting more than *an assertion of a claim,* made in good faith, and on grounds within the bounds of reason, that the defendant is indebted to him in a sum. Similarly, a plaintiff cannot foretell the amount which a court or jury would award him as damages after hearing his case. But it is not impossible before trial to make a computation, in good faith, based upon facts the affiant (in an attachment affidavit) has reason to believe exist, and upon legal principles (including measures of damages) he has reason to believe applicable, and to arrive at a specific sum of money which he can fairly state as the amount of the claim of indebtedness. This, we think, can be done in any contract action for damages of a kind legally recoverable, and is what is meant to be done by the requirement to specify.

A plausible explanation of the addition of this requirement, if any be needed, may be found in the differences in the provisions for releasing attached property, introduced by the 1857 Act. Under the 1852 Code (Chap. 104, Sec. 3, p. 372), property could be discharged from attachment if the defendant or any sufficient person for him should, be-

fore judgment, appear and put in special bail *to the value of the property attached.* In the Vogle case, the court gave as a reason why the 1852 Code foreign attachment section was not applicable to foreign corporations, that "a corporation cannot put in special bail or be surrendered to bail when it appears," and that the Legislature had made no provision by which a foreign corporation could put in special bail, or enter into security to the plaintiff to defend and abide the result of the action. 1 *Houst.* 299. Section 3 of the 1857 Act provides that an appearance by a defendant shall not dissolve the attachment of property,

"unless the defendant shall, upon causing such appearance to be entered, also bring into court *the sum of money specified as the plaintiff's demand in the affidavit,* to be filed as aforesaid, with all costs then accrued, or unless he shall give security in such form and to such amount as the court may direct for the payment of any judgment that may be recovered in said proceedings with costs." (Emphasis supplied.)

Use in connection with the obtaining of releases of attached property seems a sufficient purpose for the addition of the requirement to specify, without implying more indirect functions.[1]

We find no limitation of the kinds of claims assertable from the addition of the requirement to specify, or from the

---

[1] By amendment, the quoted portion of Section 3 has been repealed and the corresponding provisions in Section 4631 of the 1935 Code read:

"* * * if the defendant in the attachment or any sufficient person for him, shall, at any time before judgment, give security for the payment of any judgment that may be recovered in said proceedings with costs, then the garnishees and all the property attached, shall be discharged, and the attachment dissolved, * * *. Such security shall be approved, and the form and amount thereof determined by the Court in term time, or by any judge thereof, in vacation; * * *."

It is apparent that a specification of the amount of indebtedness is still a natural and reasonable requirement relating to the method of obtaining releases from attachment under the present provisions.

omission of any cause of action method in the 1857 Act. Why the alternative method was omitted we do not know. It may well have been because it was deemed of little practical utility in the case of foreign corporations. In any event, since we have held that the two initiating methods under the 1852 Code provisions were coextensive in scope with respect to claims assertable, the omission of the first method is of little significance here.

Apart from the language of the provisions themselves, neither the defendant nor the court below has suggested any reason for differentiating between a non-resident individual and a foreign corporation with respect to the kinds of claims assertable against them by foreign attachment. Nothing about the situations of such defendants furnishes any reason for treating them differently in this regard.

We have examined authorities in other jurisdictions. With respect to them, we agree with the Superior Court that they "must be evaluated with a clear knowledge of the theory and statutory provisions of that jurisdiction where the question arose." We have found no cases involving statutory provisions and histories sufficiently comparable to ours to afford much assistance in construing our legislation. For the reasons stated above, we construe the 1857 Act as authorizing attachments in cases involving any ex contractu claims.

There have been no legislative changes in the 1857 Act, or in the attachment laws generally, which would indicate that the foregoing construction of the affidavit clause is inappropriate. If anything, the general changes manifest a tendency to expand the operation of foreign attachment. In 1898, the Superior Court decided that the non-resident individual attachment statute was inapplicable in tort cases. Smith v. Armour & Co., 1 Penn. 361, 40 A. 720. In 1901,

the .General Assembly passed an act authorizing foreign attachment process in tort actions, whether against an individual or a corporation. 22 *Laws of Del.*, p. 496, *Rev. Code, 1935*, Sec. 4632. With reference to the actions in which foreign attachment will lie, Judge Woolley said in his book on *Delaware Practice* (Vol. 2, Sec. 1277) :

"Foreign attachment is not a *form of action*, but is a *process*, and since its use has been extended to actions sounding in tort, it may be employed in all forms of action to which the process of summons against a resident is appropriate."

Thus, there now exists no policy which militates against utilizing foreign attachment process in all contract actions. To hold it so authorized would make foreign attachment available in tort and contract actions against nonresident individuals and corporations alike; whereas, under the ruling of the Superior Court, there would be left a field of contract actions in which, for no discernible purpose, the process would not be applicable against corporations, although applicable against individuals. We adopt the former meaning as the proper construction of Section 4631 of the *Revised Code.*

It is, therefore, not a valid objection to the writ that any damages to which plaintiff may be entitled are not within the qualifications which defendant has urged. In so concluding, we do not decide whether the declaration states any cause of action. Indeed, our decision does not absolve plaintiff's case from any defense, excepting only that if it subsequently be determined that the declaration shows a good cause of action ex contractu for damages of a kind legally recoverable, the character of the damages shall not constitute an objection to his having begun the action under Section 4631 of the Code. At this stage, that is as far as we think we should go, and as far as we have gone.

What has been said about the case discussed above is applicable to the other two cases on review.

The orders should be reversed and the causes remanded.